**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
**_physically received_ in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 31, 2019**

# In the Court of Appeals of Georgia

A19A1238. SHAMBLIN et al. v. CORPORATION OF THE
PRESIDING BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS et al.

A19A1239. SHAMBLIN et al. v. CORPORATION OF THE
PRESIDENT OF THE CHURCH OF JESUS CHRIST OF
LATTER DAY SAINTS.

REESE, Judge.

These consolidated appeals arise from a wrongful death case brought by Deisha Shamblin ("Appellant") in her individual capacity as the spouse of Steven Shamblin ("decedent") and as the administrator of the decedent's estate, as well as in her capacity as the mother and natural guardian of the couple's minor child ("P. S."). The trial court dismissed the complaint as to Paulding County Post III, Inc. d/b/a American Legion Post 111 ("Post 111"), and, in Case No. A19A1238, the Appellant appeals from that judgment, arguing that the court erred in finding that her claims

against Post 111 were barred by charitable immunity. In addition, the trial court granted summary judgment to the Corporation of the Presiding Bishop of the Church of Latter Day Saints ("Church"), and granted partial summary judgment to Stevan Crew and William Hayes. In Case No. A19A1239, the Appellant appeals from that judgment, arguing that jury issues exist as to whether the Church was involved in a joint venture with Post 111 and whether these defendants are liable on P. S.'s claim for negligent infliction of emotional distress. For the reasons set forth infra, we affirm the trial court's judgment in each case.

The following facts are undisputed. For several years prior to July 4, 2015, the City of Dallas ("City") and Post 111 conducted a service project in Paulding County three to four times a year. The purpose of the project ("flag project") was to honor the deceased military service members from the county by erecting American flags along the shoulder of Highway 278. Post 111 provided an antique 1953 Ford F-600 fire truck ("fire truck") that it owned, and the City provided an F-350 Ford truck, driven by a City employee, that pulled a flat-bed trailer.[1] Both vehicles were used to transport the flags and community volunteers along the highway; the volunteers erected the flags in the morning and then removed them the same afternoon. A

_____

[1] The Appellant did not name the City as a defendant in this case.

Paulding County police patrol car, with its blue lights flashing, followed each vehicle for safety purposes.

Post 111 only allowed members of its organization to drive its fire truck, and it required a second member to ride in the cab whenever the fire truck was driven during service projects, parades, or other official Post 111 functions. Crew was a member of both Post 111 and the Church, and he drove Post 111's fire truck on July 4, 2015, while Hayes, the commander of Post 111, rode alongside Crew as a passenger in the fire truck's cab. Crew had previously driven the fire truck for the flag project 15 to 20 times with Hayes as a passenger, and Hayes had never seen Crew have any difficulty driving the fire truck or do anything reckless or negligent while driving it, nor had he (Hayes) received any complaints from anyone else regarding Crew's driving.

The decedent was a member of the Church, had volunteered with the flag project for several years prior to 2015, and was in charge of the safety of all the volunteers riding on the fire truck. The decedent also helped recruit other Church members as volunteers for each flag project, and all of the volunteers on the day at issue were Church members, except for Hayes.

In the late afternoon of July 4, 2015, the decedent and 12-year-old P. S. were riding with about 12 other volunteers on the back of the fire truck as it drove along the highway between stops to collect the flags. The decedent was standing on a small metal deck attached to the back of the fire truck and was holding onto a pole attached to the truck's side. According to a friend and fellow volunteer, the decedent always stood in the same place on the back of the fire truck during the flag project. P. S. rode in the bed of the fire truck with the flags and other volunteers; he stated in his deposition that his dad would not let him ride on the back of the truck because it was "unsafe." After the group had collected all of the flags from the highway's shoulder, Crew drove the fire truck to a nearby parking lot, where the flat-bed trailer and other volunteers were waiting. Before stopping the fire truck in the parking lot, Crew made a "U-turn" around a light pole so he could pull the fire truck up next to the flat-bed trailer, onto which the volunteers would load all of the flags. According to Hayes, Crew made the U-turn in the parking lot the same way he (Crew) had done it during flag projects over the past 20 years.[2]

---

[2] Further, the path on which Crew drove the fire truck during the flag project had two more U-turns along the way, so that each day he drove the fire truck for the flag project, Crew made six U-turns total (three in the morning and three in the afternoon).

At some point during the U-turn, however, the decedent either fell or was thrown off the back of the fire truck and landed on the asphalt lot, violently striking his head against the hard surface ("the incident"). Although P. S. did not witness the incident, he saw his father lying motionless on the asphalt, and he witnessed as other volunteers, then law enforcement officers and paramedics, tried to revive the decedent before loading him onto a helicopter to be transported to the hospital. As a result of the incident, the decedent suffered a fractured skull and brain injuries, and he died of those injuries two days later.

The Appellant filed the instant wrongful death suit against Post 111, the Church, Crew, Hayes, and others, asserting that Crew, as an agent acting on behalf of both Post 111 and the Church, negligently drove Post 111's fire truck and that such negligence caused the decedent's death. The complaint alleged that Hayes, as Post 111's commander, negligently allowed Crew to drive the fire truck and negligently supervised him. In addition, the complaint asserted that the "Defendants" (Post 111 and the Church) negligently entrusted the operation of the fire truck to Crew, inadequately trained Crew in the safe operation of the fire truck, and negligently supervised Crew during his operation of the fire truck. The complaint also asserted a claim on behalf of P. S. for negligent infliction of emotional distress ("NIED")

5

based upon the emotional distress that resulted from "witnessing his father's body laying in the parking lot after [the] incident" and "hearing and watching his father die from his injuries[.]"

Post 111 moved to dismiss the complaint, asserting that the claims were barred by its charitable immunity. Following a hearing, the trial court granted the motion and dismissed all claims against Post 111. The Church, Crew, and Hayes subsequently moved for summary judgment on the complaint. Following a hearing, the trial court granted summary judgment to the Church on all of the Appellant's claims, and granted Crew and Hayes partial summary judgment, ruling in their favor on the NIED claim, only. These appeals followed.

1. As an initial matter that is dispositive on issues in both Case No. A19A1238 and Case No. A19A1239,[3] the trial court granted summary judgment to the Church on the Appellant's claims of negligent entrustment, negligent training, and negligent supervision of Crew. In so ruling, the court specifically held that "the undisputed evidence [showed] that Crew was not incompetent or reckless. There [was] evidence that Crew had driven the truck on many previous occasions without incident and that he was good at driving the truck." The trial court ruled that, because the Appellant

_____

[3] See Divisions 2 (b) and 3, infra.

failed to produce any evidence of incidents in which Crew exhibited behavior that was similar to that which allegedly caused the injuries in this case, "there [was] no evidence that anyone knew or should have known that Crew would engage in any reckless behavior[ ]" on the day at issue.[4] Accordingly, the Appellant could not prevail on her claims for negligent entrustment, training, and/or supervision as a matter of law.

On appeal, the Appellant does not challenge the trial court's ruling on the merits of those claims, i.e., that she had failed to present any evidence to create a jury

---

[4] See *Zaldivar v. Prickett*, 297 Ga. 589, 602 (2) (774 SE2d 688) (2015) (To hold a person liable for negligent entrustment, the plaintiff would have to present proof that the defendant had "actual knowledge of the incompetence or recklessness of the person to whom the instrumentality in question is entrusted[.]"); *Barnes v. Smith*, 339 Ga. App. 607, 609 (2) (794 SE2d 262) (2016) ("For an employer to be held liable for negligent supervision, there must be sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff.") (citations and punctuation omitted); *Doe v. Y.W.C.A. of Greater Atlanta*, 321 Ga. App. 403, 408 (2) (740 SE2d 453) (2013) ("An employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable that the employee's tendencies could cause the type of harm sustained by the plaintiff. . . . In order to defeat summary judgment on a claim for negligent training and supervision, a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue.") (citation and punctuation omitted).

issue on them. Consequently, any error as to that ruling is deemed abandoned,[5] and it is affirmed as a matter of law.[6]

*Case No. A19A1238*

2. The Appellant contends that the trial court erred in dismissing Post 111 based on a finding that the organization's charitable immunity had not been waived. She asserts two bases that she claims constituted at least a partial waiver of Post 111's immunity: her claims against Post 111 for its "active negligence" were not barred by its charitable immunity, and she had an uninsured motorist ("UM") policy that provided coverage for her claims. These assertions present no reversible error.

The general purpose of the charitable immunity doctrine is that a qualifying organization's charitable assets should not

> be depleted by subjection to liability for negligence and that it would be
> against public policy, as well as against the settled principles of law, to
> allow any judgment to be rendered against it because of the negligence

---

[5] See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

[6] See *Cotton v. Smith*, 310 Ga. App. 428, 429 (1) (714 SE2d 55) (2011) (Because the appellant failed to assert any error as to a specific ruling in the trial court's order, any error as to that ruling was deemed abandoned, and that ruling was affirmed by operation of law.).

8

of any of its employees or agents, except where it failed to exercise ordinary care in selecting and retaining its employees and servants.[7]

A charitable organization, however, may choose to purchase a liability insurance policy in order to protect its charitable assets from being depleted by a judgment of liability for injuries or damages that may arise while the organization is carrying out its charitable functions, while still ensuring that such injuries or damages are compensated for from its non-charitable asset, the liability insurance.[8] In such a situation, "[t]he delivery and the acceptance of an insurance liability policy between an insurance company and a charitable institution and the payment and acceptance of its premium constitutes, as to the amount of the policy, a waiver by the charity and by the insurance company of the immunity otherwise accorded to the charitable assets."[9] In other words, "[a] charitable institution waives charitable immunity to the

---

[7] *Cox v. DeJarnette*, 104 Ga. App. 664, 670 (1) (123 SE2d 16) (1961) (citation and punctuation omitted).

[8] Id. at 672 (1); see *Ponder v. Fulton-DeKalb Hosp. Auth.*, 256 Ga. 833, 835 (2) (353 SE2d 515) (1987) ("A liability insurance policy is a non-charitable asset which is not covered by the charitable immunity doctrine.").

[9] *Cox*, 104 Ga. App. at 672 (1).

9

extent of any liability insurance which it carries."[10] Any liability that exceeds the policy limits, however, is barred by charitable immunity, unless that liability is premised on a claim to which charitable immunity does not apply.[11]

Here, there is no dispute that Post 111 is a charitable organization[12] and that it is entitled to charitable immunity. Instead, the only material issue in dispute as to Post 111's liability in this case is *whether that immunity has been waived and, if so, to what extent*.

(a) The undisputed evidence shows that, prior to the date of the incident, Post 111 had purchased two liability insurance policies: one with Ironshore Indemnity, Inc. ("Ironshore"), which provided coverage for Post 111's fire truck, and another with Owners Insurance Company, which was a combined property and commercial general liability policy that did not cover the fire truck or the incident. Before the Appellant filed her complaint against Post 111 and the other defendants, Ironshore

---

[10] *Ponder*, 256 Ga. at 835 (2) (citations and punctuation omitted).

[11] See id.; *Y.M.C.A. of Metro. Atlanta v. Bailey*, 107 Ga. App. 417, 420 (130 SE2d 242) (1963); *Cox*, 104 Ga. App. at 670 (1).

[12] See 26 USC § 501 (c) (19) ("A post or organization of past or present members of the Armed Forces of the United States" is exempt from federal taxation.).

paid the Appellant its policy's limit, $100,000. In exchange, the Appellant signed a

"Limited Liability Release" ("Release") in which she

> acquit[ted], remise[d], release[d], and forever discharge[d] [Post 111], *except to the extent other liability insurance is available which covers the claim or claims of the [Appellant] against [Post 111]*, from any and all claims, demands, rights, and causes of action of whatsoever kind and nature, specially including but not limited to, all known and unknown bodily and personal injuries and all damages sustained by the [Appellant], including damage to property[ and all] medical expenses, that belong to the [Appellant] or which may hereafter accrue to the [Appellant] on account of or resulting from the incident [at issue in this case that resulted] in the wrongful death of [the decedent].[13]

During the hearing on Post 111's motion to dismiss, the Appellant's counsel specifically admitted that Post 111 could not be held liable for any damages in this case because Ironshore had paid the limits of Post 111's liability policy, $100,000, and the Appellant had signed the Release.

In granting Post 111's motion to dismiss, the trial court did not address whether the Release barred the Appellant's claims against Post 111 in this case. The court ruled, however, that there was no evidence that Post 111 had purchased any liability

---

[13] (Emphasis supplied.)

policies, besides Ironshore's, that provided coverage for the Appellant's claims and, because the policy limit of the Ironshore policy had been paid to the Appellant, Post 111 had charitable immunity that protected it from liability on the Appellant's complaint.

(b) The Appellant contends that the trial court erred in ruling that Post 111's charitable immunity protected it from liability on her claims for Post 111's "affirmative or active negligence" in entrusting, training, and/or supervising Crew in his operation of the fire truck.[14] She argues that such claims are legally indistinguishable from claims that are not barred by charitable immunity, such as negligent hiring and retention, and, therefore, the trial court erred in finding that Post 111 was immune from those claims.[15]

---

[14] See *Bailey*, 107 Ga. App. at 420 ("It is settled in Georgia that the doctrine of charitable immunity from tort liability does not extend to the corporate or original negligence of the charitable entity in the employment or retention of incompetent employees but only affords protection from vicarious liability for the negligent acts of said agents and employees.").

[15] See id. at 420 ("The failure to exercise ordinary care to provide a sufficient number of competent and adequately instructed employees and the failure to exercise ordinary care in selecting or retaining competent employees cannot be distinguished."); see also *Harrell v. Louis Smith Mem. Hosp.*, 197 Ga. App. 189, 191 (2) (b) (397 SE2d 746) (1990) ("[T]he doctrine of charitable immunity [did] not extend to any negligence of the appellee hospital . . . in failing to provide a sufficient number of competent and adequately instructed employees for its staff.") (citations

Regardless whether the trial court erred in ruling that Post 111 was immune from liability on her claims for negligent entrustment, training, and/or supervision,[16] however, Post 111 still would have been entitled to judgment as a matter of law on those claims for the reasons discussed in Division 1, supra. Consequently, any error in the trial court's ruling was harmless.[17]

(c) The Appellant also argues that the trial court erred in dismissing Post 111 from the case because, when the case goes to trial with the remaining defendants, a jury could find that Post 111 was negligent and award her damages based upon such negligence. According to the Appellant, even if she would not be able to collect those

and punctuation omitted).

[16] As for the remaining claims the Appellant asserted against Post 111, the Appellant does not dispute that her claim that Post 111 was vicariously liable for the alleged negligence of its "agent," Crew, was barred by its charitable immunity. See *Bailey*, 107 Ga. App. at 420; *Cox*, 104 Ga. App. at 670 (1). And, pretermitting whether Post 111's charitable immunity barred the NIED claim the Appellant asserted on behalf of her son, the Appellant could not prevail on such claim as a matter of law for the reasons given in Division 4, infra.

[17] See *Austell HealthCare v. Scott*, 308 Ga. App. 393, 395 (1) (707 SE2d 599) (2011) ("In order to constitute reversible error, both error and harm must be shown.") (citation and punctuation omitted); see generally *Brooks v. Multibank 2009-1 RES-ADC Venture*, 317 Ga. App. 264, 268 (2) (730 SE2d 509) (2012) (finding no reversible error when the plaintiff failed to show that the court's ruling would have been different if he had had more time to present additional evidence).

damages from Post 111 due to its charitable immunity, she would still be able to collect those damages under her UM policy.[18]

As we held in Divisions 1 and 2 (b), supra, however, no jury issues remain on the Appellant's claims against Post 111. Consequently, this argument presents no reversible error.

(d) Given our decisions in the preceding subdivisions, the Appellant's argument that the trial court erred in dismissing her claims against Post 111 under OCGA § 9-11-12 (b) (1), instead of OCGA § 9-11-12 (b) (6), is moot, as our consideration of this argument would not change the outcome of this appeal.

Consequently, under the circumstances presented, we find no reversible error in the trial court's dismissal of Post 111.

*Case No. A19A1239*

3. The Appellant argues that the trial court erred in granting summary judgment to the Church on her vicarious liability claims, which were based on Crew's allegedly negligent driving of the truck. According to the Appellant, at the time of the incident, the Church was involved in a "joint venture" with Post 111 (the flag project), and

---

[18] The Appellant's UM insurance provider, Country Mutual Insurance Company, remains a defendant in the suit.

Crew was participating in that joint venture as an "agent" of both the Church and Post 111. The Appellant argues that, as a result, the Church was just as responsible for Crew's alleged negligence as Post 111. These arguments lack merit.

> A joint venture arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other. The right to exercise mutual control is a crucial part of a joint venture. For a joint venture to exist, there must be not only a joint interest in the purpose of the enterprise[,] but also an equal right, express or implied, to direct and control the conduct of one another in the activity causing the injury (in this case the operation of the [fire truck]). The general principles of agency law apply where defendants are joint venturers.[19]

In this case, the Appellant specifically and repeatedly argued in the trial court that *no joint venture existed between the parties*. For example, in Appellant's responsive brief to the Church's summary judgment motion, the Appellant's counsel stated: "The defendants [are trying] to get [the Appellant] and [the trial court] to gallop down the path of joint venture, borrowed servant, etc., *issues that are not in*

---

[19] *Williams v. Chick-fil-A*, 274 Ga. App. 169, 170 (617 SE2d 153) (2005) (citations and punctuation omitted).

*issue in this case*, and [are] simply a sidetrack of issues of *no value to the analysis* before the [trial court]."[20] And, during the summary judgment hearing, the Appellant's counsel specifically denied that joint venture applied in this case, calling it a "red herring[.]"

Second, even if these statements did not constitute an affirmative waiver of the Appellant's joint venture argument,[21] the undisputed evidence showed that the flag project was created and organized by Post 111 and the City and was supported by volunteers, many of whom happened to be members of the Church. As the trial court noted, the fact that Crew and the rest of the volunteers for the flag project were Church members did not create a joint venture between Post 111 and the Church.

Third, the Appellant's counsel *also* specifically admitted during the summary judgment hearing that the Appellant could not prevail on her vicarious liability claims. This is because, as the trial court ruled in its order granting summary judgment to the Church, the record simply did not support the Appellant's argument

---

[20] (Emphasis supplied.)

[21] See *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) ("To consider the case on a completely different basis from that presented below would be contrary to the line of cases holding, 'He must stand or fall upon the position taken in the trial court.'") (punctuation and footnote omitted).

16

that Crew was driving the fire truck as an agent of the Church on the day of the incident. As shown above, the undisputed evidence showed that the Church had no control over the operation of the truck and was not authorized to (and did not) select Crew to drive the fire truck. Instead, Post 111, as the sole owner of the fire truck, insured and maintained the truck, controlled when the truck would be used and who would drive it, prohibited anyone but a member from driving it, and required that two members be present in the truck during its operation. As a result, the Appellant failed to show that Crew was acting as an agent of the Church when he was driving the fire truck on the day of the incident.

Under these circumstances, we hold that the trial court did not err in granting summary judgment to the Church on the Appellant's vicarious liability claims.[22]

----

[22] See *Harrell*, 197 Ga. App. at 190 (2) (a) ("On summary judgment, [the] movant has the burden of showing there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. When, as in the instant case, [the] movant is a defendant, it has the additional burden of piercing the plaintiffs' pleadings and affirmatively negating one or more essential elements of the complaint. In ruling on a motion for summary judgment, the opposing parties should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions arising therefrom most favorably toward the parties opposing the motion. Yet once the party moving for summary judgment has made out a prima facie case, the burden of proof shifts to the opposing parties who must come forward with rebuttal evidence or suffer judgment against them.").

4. The Appellant also contends that the trial court erred in granting summary judgment to the Church, Crew, and Hayes on her son's NIED claim. We disagree.

"In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury."[23] As the trial court found, there was no evidence in this case that the decedent's son suffered a physical injury during the incident.

One exception to the impact rule, however, is when there is "a pecuniary loss resulting from an injury to the person which is not physical; . . . the mental pain and suffering must cause a physical injury to the person."[24] The Appellant alleges that her son required psychological treatment for the emotional distress caused by witnessing the aftermath of the incident and that such treatment constituted a pecuniary loss for which he was entitled to recover.

As the trial court concluded, even if the Appellant's son suffered a physical injury that would fall under the pecuniary loss exception to the impact rule, he did not suffer a pecuniary loss, because he was not legally responsible for the cost of his

---

[23] *Ryckeley v. Callaway*, 261 Ga. 828 (412 SE2d 826) (1992).

[24] *Phillips v. Marquis at Mt. Zion-Morrow*, 305 Ga. App. 74, 77 (699 SE2d 58) (2010) (punctuation and footnote omitted).

18

treatment. "Under OCGA § 19-7-2,[25] parents are responsible for medical expenses incurred in the treatment of their minor children. Because parents have this responsibility, the right to recover damages for medical expenses incurred in such treatment is vested exclusively in a minor child's parents."[26]

Consequently, because the Appellant's son did not suffer a physical or mental injury that caused him to suffer a pecuniary loss, he could not prevail on his NIED claim. It follows that the trial court did not err in granting summary judgment to the Church, Crew, and Hayes on this claim.[27]

---

[25] See OCGA § 19-7-2 ("It is the joint and several duty of each parent to provide for the maintenance, protection, and education of his or her child until the child reaches the age of majority, dies, marries, or becomes emancipated, whichever first occurs, except as otherwise authorized and ordered pursuant to subsection (e) of Code Section 19-6-15 and except to the extent that the duty of the parents is otherwise or further defined by court order.").

[26] *Wilson v. Obstetrics & Gynecology of Atlanta*, 304 Ga. App. 300, 308 (3) (696 SE2d 339) (2010) (citation and punctuation omitted); accord *Swallow v. Adams-Pickett*, 344 Ga. App. 647, 648 (3) (811 SE2d 445) (2018).

[27] See *Wilson*, 304 Ga. App. at 308-309 (3); cf. *Oliver v. McDade*, 297 Ga. 66, 67-68 (772 SE2d 701) (2015) (Following a violent collision between a truck and a tractor-trailer, the plaintiff sought damages for psychological treatment and other costs that arose from the emotional distress he suffered as a result of his physical injuries and his witnessing the aftermath of his friend's sudden death. Because there was a jury issue as to the proper allocation of damages that he was entitled to recover on his NIED claim, and those damages that were not recoverable, the trial court properly denied the defendant's motion for summary judgment.).

*Judgments affirmed. Rickman, J. concurs. Miller, P. J., concurs in Divisions 1, 2, and 3 and in judgment only in Division 4.*


**\*DIVISION 4 OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2(a).**